DOROTHY M. CAMPAGNA AND ANTHONY W. CAMPAGNA, APPELLEES AND CROSS-APPELLANTS, V. ANN HIGDAY, TRUSTEE OF THE ANN HIGDAY INTER VIVOS TRUST, APPELLANT AND CROSS-APPELLEE.

714 N.W.2d 770

Filed May 16, 2006.    No. A-04-1251.

Patrick J. Sullivan and Michael F. Polk, of Adams & Sullivan, P.C., for appellant.

Kevin J. McCoy, of Dwyer, Smith, Gardner, Lazer, Pohren, Rogers & Forrest, L.L.P., for appellees.

INBODY, Chief Judge, and IRWIN and CARLSON, Judges.

CARLSON, Judge.

## INTRODUCTION

Ann Higday, trustee of the Ann Higday Inter Vivos Trust, appeals and Dorothy M. Campagna and Anthony W. Campagna, husband and wife, cross-appeal from an order of the district court for Sarpy County setting aside certain property to the Campagnas by virtue of mutual recognition and acquiescence. For the reasons set forth below, we affirm as modified.

## BACKGROUND

The record shows that Ann has lived on an 80-acre piece of property in Sarpy County near Bellevue since January 1956. Ann's grandson, Mark Michalek, lives on the same property. In January 1956, Ann and her husband, Gerald Higday, purchased the property, and in March, they deeded approximately 40 acres of the property to Ann's brother and his wife, Joseph Tribulato and Alice Tribulato. The Higdays deeded the north portion of the property to the Tribulatos while retaining the south portion. After Alice died, Joseph deeded his property in 1985 to the Tribulatos' daughter, Dorothy, reserving a life estate. Upon Joseph's death in 1996, Dorothy became the owner of the property and added Anthony's name to the property's title. In 2001, Ann, who had become the sole owner of the Higdays' property due to Gerald's death, conveyed title to the property to the Ann Higday Inter Vivos Trust.

There is no record of any boundary disputes between the families until the Campagnas' daughter, Linda Roth, ordered a survey of the property, which was completed on November 25, 2002.

On June 3, 2003, the Campagnas filed an amended petition to quiet title to two parcels of land within the original 80-acre property, which parcels we will refer to as "Parcel 1" and "Parcel 2." As to Parcel 1, the Campagnas stated that after the Tribulatos purchased their 40 acres from Ann, the Tribulatos constructed a house in which they resided until their respective deaths. A tenant of the Campagnas currently leases that home. The Campagnas noted that the 2002 survey indicates that the south side of the house extends 8.6 feet south of the surveyed boundary line, onto Ann's property.

The record shows that south of the house and approximately 35 feet south of the surveyed boundary line are two large trees that were planted at the time the house was built. From the 1950's until about 5 years prior to trial, there was a white fence just south of the two trees, which fence ran east to west and ended just a few feet east of the north-south road providing access to both properties.

The Campagnas alleged that from the 1950's to the present, the fenced area served as a side yard for the house. Therefore,

this portion of the property will be referred to hereinafter as the "side yard of Parcel 1."

Besides the portion of Parcel 1 described above, the Campagnas requested that the trial court quiet title to the remainder of Parcel 1. Specifically, the Campagnas described an area involving a crop line southwest of their house which, according to the survey, extends south onto Ann's property. The Campagnas alleged that they or their agents had farmed the entire area north of the crop line every year since the 1950's. Hereinafter, we will refer to this property as the "crop line of Parcel 1."

As to the two pieces of land constituting Parcel 1, the Campagnas alleged that for more than 10 years they had been in actual, continuous, exclusive, notorious, and adverse possession under a claim of ownership. In the alternative, the Campagnas alleged that they were entitled to quiet title of Parcel 1 by mutual recognition and acquiescence.

Concerning Parcel 2, the Campagnas alleged that in the 1960's, the Higdays constructed a fence running east to west in the east section of the parties' properties. The Campagnas alleged that from that date forward, the Tribulatos and their successors farmed the land north of the fence. The Campagnas also stated that the 2002 survey indicates that the legal boundary between the parties' properties is approximately 120 feet north of the present fence line. The Campagnas stated that by virtue of adverse possession, they are entitled to quiet title to the strip of land lying between the southern boundary of their property as surveyed and the position of the fence approximately 120 feet further south, which strip is legally described as Parcel 2.

The Campagnas alleged that at all times since the construction of the fence, and for more than the past 10 years, they and the Tribulatos have been in actual, continuous, exclusive, notorious, and adverse possession under a claim of ownership to Parcel 2. The Campagnas also alleged that in the alternative, they are entitled to quiet title to Parcel 2 because the Higdays have recognized and acquiesced in the fence as a boundary between the properties.

On June 16, 2003, Ann filed an answer to the Campagnas' amended petition. As an affirmative defense, Ann stated that the Campagnas' possession of any of the real estate in Parcels 1

and 2 was by permission. Ann also stated that the Campagnas and their predecessors in interest, by virtue of their family relation to her, were required to give actual notice that such possession was adverse and that they failed to do so. Furthermore, Ann stated that any and all fences on both parcels were installed out of convenience and were never erected to establish or recognize boundaries.

Trial was held on September 27, 28, and 30, 2004. With regard to the side yard of Parcel 1, Dorothy testified that she was aware that her house extends onto Ann's property, but could not remember when she learned of that fact. Dorothy testified that there is a yard on the south side of the house. Both Dorothy and her daughter, Linda, testified that until a few years prior, a white rail fence had run east to west behind the house, encompassing the yard. Dorothy testified that her father, Joseph, had mowed the grass within the fence. Ann did not contradict Dorothy's testimony regarding the side yard, stating that Joseph had a yard in back of his house which he mowed and that that yard was Joseph's property.

As to the remaining property in Parcel 1—the area denoted by the crop line—the record contains a survey dated January 28, 2003, which shows that the surveyors located a crop line on Ann's property, just south of the actual dividing line between the properties as surveyed. Dick Daniel testified that from 1992 to 2002, he farmed the entire area north of the crop line for the Campagnas. Dick testified that the proceeds from the crops north of the crop line went to the Campagnas while the proceeds from the crops south of the crop line went to Ann. Dick testified that the crop line was easily visible to both families. Dick also testified that the crop line was along the same east-west course as the former white rail fence south of the house.

Steve Roth testified that he farmed the Higdays' land from 1992 through 2002, and he also stated that he followed the crop line, farming the area south of the crop line but not the area north of the crop line. Steve testified that the crop line was apparent, given that he and Dick would normally plant different types of crops.

Dick and Steve also testified in detail regarding the fence line on Parcel 2. Dick testified that he farmed the Tribulatos' or

Campagnas' property from the 1970's until 2002 and that he farmed the Higdays' land until 1991. Dick testified that in the mid-1970's, the Higdays built a fence between the eastern properties, on the southern edge of Parcel 2. The record shows that trees subsequently grew within the fence, eventually forming a dense tree line. Dick testified that from the mid-1970's until the mid-1980's, he farmed the property on the north side of the fence for the Tribulatos but did not farm south of the fence for the Higdays, given that the Higdays pastured horses on that side of the fence.

Dick testified that when the Higdays stopped pasturing horses in the mid-1980's, he began farming south of the fence for the Higdays. Dick testified that Ann never indicated to him that she owned the property north of the fence. Dick testified that during the time he farmed both sides of the fence, he gave the proceeds from the crops north of the fence to the Tribulatos or the Campagnas and the proceeds from the crops south of the fence to the Higdays. Dick testified that he did so because he "assumed that the fence was the property line." Dick testified that to his knowledge, the Higdays never gave the Campagnas or the Tribulatos permission to farm the north side of the fence. Dick described Ann as "very businesslike," meaning that "if she had a dollar coming, it was hers."

Dick testified that when the Higdays farmed the land south of the fence, there was an opening in the tree line which would allow access to the other side of the fence. Dick testified that at times, the Higdays had used the contested area north of the fence to ride four-wheelers or horses.

Steve testified that he had farmed the Higdays' land since 1992, which land included the property up to the fence line but never past it. Steve testified that Ann never indicated that she owned any of the property north of the fence.

Scott Roth, Linda's husband, testified that in the spring of 1985, he was approached by the Higdays and Joseph to prepare an estimate for removing the trees within the fence line. Scott testified that he talked to Ann about it and that she told him she wanted only the trees removed, not the fence, because the fence line reflected the property line. Scott testified that at the time, the trees in the fence line were approximately 10 to 15 feet high,

in contrast to their height of 30 to 40 feet at the time of trial. Scott testified that the parties wanted the trees removed so that they could farm closer to the fence. Scott also testified that he never removed the trees, because Joseph would not pay for his half of the cost, despite an agreement between Joseph and Ann to split the costs.

Linda testified that the parties always recognized the tree line as the boundary between the properties until the 2002 survey revealed otherwise. Linda testified that she had the survey done because she was considering purchasing the property. Linda testified that prior to completion of the 2002 survey, surveyors placed stakes indicating that the property line was well south of the fence line. Linda testified that after Ann expressed concern over this fact, she told Ann not to worry and that Linda would continue to recognize the fence line as a boundary. Linda testified that eventually, the survey showed the property line was actually north of the fence, and that Ann refused to talk about the subject further.

Mark, Ann's grandson, testified that he helped Gerald build the fence on Parcel 2 in the spring of 1975 to keep horses out of the crops in the summer. Mark testified that there is a 25- to 30-foot break in the fence. Mark testified that the Higdays continued to use the contested area north of the fence after the fence was erected. Specifically, Mark testified that they rode horses, hunted, and rode snowmobiles on that property when crops were not in the field. Mark stated at trial, "To this day, we all cross the property."

Mark testified that while installing the fence, Gerald used an old river map as a guide. Mark testified that Gerald walked off 600 feet worth of paces, being careful not to go over the property line, although Mark acknowledged that for much of the fence, Gerald went well beyond the property line. When asked if it was possible that Gerald was trying to follow the actual boundary line, Mark stated that it was not, given that Gerald was trying to keep the fence 60 feet short of the Tribulatos' land.

Mark testified that he did not consider the fence line to be the boundary between the two properties, but Mark acknowledged that in his deposition, he stated that he had recognized the fence line as a boundary for the last 27 years. Mark also testified that

prior to 2002, he never heard anybody in his family indicate that the boundary line was not the fence line.

Dorothy testified that she considered the area north of the fence line to be her property and that since 1985, she or her father had received the proceeds from the crops in the area north of the fence. Although Ann testified that she is unsure if the fence line is the boundary between the two properties, she did state that the land on the south side of the fence belonged to her and the property to the north side of the fence belonged to Joseph.

In an order filed October 12, 2004, the district court found that the Campagnas had established a boundary line by mutual recognition and acquiescence regarding the side yard of Parcel 1 and the fence line on Parcel 2, but not as to the crop line of Parcel 1. The court found that the Campagnas had failed to prove adverse possession as to both parcels. The trial court ordered that a survey be completed in order to legally describe the properties' boundaries.

On October 21, 2004, the Campagnas filed a motion to alter or amend the judgment for the limited purpose of incorporating the survey requested by the court or, in the alternative, asking the court to reference in its order the legal descriptions as set forth in the exhibits offered at trial. The trial court granted the Campagnas' motion and filed an amendment to the decree setting forth the legal boundaries "[i]n accord with the recommendations of counsel for both parties." Ann appeals, and the Campagnas cross-appeal.

## ASSIGNMENTS OF ERROR

On appeal, Ann contends that the trial court erred in (1) concluding that the Higdays and the Campagnas mutually recognized and acquiesced in the side yard of Parcel 1 as a boundary between the properties and in the fence line on Parcel 2 as another boundary between the properties, (2) failing to recognize that permissive use of property between owners sharing a close family relationship precludes claims for mutual recognition and acquiescence, and (3) failing to exactly describe the mutually recognized and acquiesced boundaries between the two properties.

In the Campagnas' cross-appeal, they contend that the court erred in (1) failing to receive certain photographs into evidence, (2) failing to quiet title in the Campagnas as to the area north of

the crop line of Parcel 1 on the grounds that the parties recognized and acquiesced in the established crop line as a boundary for more than 10 years, and (3) finding that the Campagnas were not entitled to all or, in the alternative, part of Parcels 1 and 2 by way of adverse possession.

## STANDARD OF REVIEW

■ A quiet title action sounds in equity. *Inserra v. Violi*, 267 Neb. 991, 679 N.W.2d 230 (2004). In an appeal from an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided that where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Madson v. TBT Ltd. Liability Co.*, 12 Neb. App. 773, 686 N.W.2d 85 (2004).

## ANALYSIS

*Appeal and Cross-Appeal—Mutual Recognition and Acquiescence.*

On appeal, Ann contends that the trial court erred in concluding that the parties mutually recognized and acquiesced in the side yard of Parcel 1 as a boundary between the properties and in the fence line on Parcel 2 as another boundary between the properties. In the Campagnas' petition, they asked the court to quiet title to Parcels 1 and 2.

■ When properly pleaded, the theory of adverse possession, as well as the theory of mutual recognition and acquiescence, may be raised under Neb. Rev. Stat. § 34-301 (Reissue 2004). *Kraft v. Mettenbrink*, 5 Neb. App. 344, 559 N.W.2d 503 (1997).

■ Initially, we note that a dispute in which each owner admits the title of the other but disagrees as to the physical location of the boundary is a boundary dispute, not a title controversy. Boundary disputes cannot be determined in a quiet title action. Rather, boundary disputes are properly brought as an action in ejectment or pursuant to § 34-301. *Rush Creek Land & Live Stock Co. v. Chain*, 255 Neb. 347, 586 N.W.2d 284 (1998). When the parties pursue a boundary dispute as a quiet title action without objection, the mode of procedure is no longer in question. *Id.*

Therefore, given that the Campagnas brought this action as a quiet title action and there was no objection, we treat this action as one to quiet title.

Absent evidence that prior owners of property within the preceding 10 years had knowledge or notice of a purported boundary line asserted by neighboring landowners, landowners cannot prevail on a claim of mutual recognition and acquiescence. See, § 34-301; *Kraft v. Mettenbrink, supra.* In order to claim a boundary line by acquiescence, both parties must have knowledge of the existence of a line as the boundary, and therefore, the mere establishing of a line by one party and the taking by that party of possession up to that line is insufficient. *Kraft v. Mettenbrink, supra.* We note that in an adverse possession action, the burden of proof is preponderance of the evidence, and we extend that burden of proof to the instant action involving mutual recognition and acquiescence. See *Nye v. Fire Group Partnership*, 265 Neb. 438, 657 N.W.2d 220 (2003).

In the instant case, the record clearly shows that the Campagnas proved by a preponderance of the evidence that both families had knowledge of the existence of both the fence line on Parcel 2 and the side yard of Parcel 1 as boundaries between the properties. In regard to the fence line on Parcel 2, Ann argues that the fence line is a mere barrier, erected to contain horses, and was not intended as a boundary between the properties. We disagree.

Besides the evidence that both families cultivated only the property on their side of the fence, there is evidence that the Higdays considered the fence to be a boundary rather than a barrier. At trial, Linda testified that prior to completion of the 2002 survey, surveyors placed stakes indicating that the property line was well south of the fence line. Linda testified that after Ann expressed concern over this fact, she told Ann not to worry and that she would continue to recognize the fence line as a boundary. Linda testified that Ann told her that she had contacted an attorney who told her not to worry because the property was hers. Linda testified that eventually, the survey showed that the property line was actually north of the fence. Linda testified that at that point, Ann changed her mind and refused to talk about the fence line continuing to be the boundary. At trial, Ann testified

that she is unsure if the fence line is the boundary between the two properties, but she did state that the land on the south side of the fence belonged to her while the property on the north side of the fence belonged to Joseph.

Additionally, Scott testified that in the spring of 1985, he was approached by the Higdays and Joseph to prepare an estimate for removing the trees within the fence line. Scott testified that he talked to Ann specifically and that she told him she wanted only the trees removed, not the fence, because the fence line reflected the property line.

As to the side yard of Parcel 1 behind the Campagnas' house, the record shows that after the house was built in the 1950's, a fence was erected behind the house, and the property between the house and the fence was used by the Campagnas as a side yard. Ann did not dispute the Campagnas' use of this property in that manner, nor is there is any evidence that Ann objected to it. Rather, at trial, Ann testified that Joseph had a yard around his house which he mowed and that it was his own property. Given our de novo review of the evidence on this record, we conclude that the Campagnas proved by a preponderance of the evidence that both parties mutually recognized and acquiesced in the fence line on Parcel 2 and the side yard of Parcel 1 as boundaries between the properties.

■ Ann urges us to apply the presumption set out in adverse possession cases that as to parties sharing a parental or filial relationship, possession of land of one by the other is presumed to be permissive. See *Kraft v. Mettenbrink*, 5 Neb. App. 344, 559 N.W.2d 503 (1997). Our review of this law shows that this presumption has not been applied to a Nebraska case involving mutual recognition and acquiescence.

Furthermore, even if we were to apply this presumption in the instant case, Ann's argument must fail. On this record, the Campagnas presented evidence to rebut a presumption of permissiveness. Specifically, when Ann was asked if she ever told Joseph that he could farm part of her property, she stated: "No. He farmed his part." Additionally, both Dick and Steve testified that the Higdays never gave the Campagnas permission to farm the area north of the fence, and Dorothy specifically denied that Ann had ever given Dorothy permission to farm any of the

Higdays' land. Therefore, we reject Ann's argument that a presumption of permissive use applies to the instant case.

In the Campagnas' cross-appeal, they argue that the trial court erred in failing to quiet title in them as to the area north of the crop line of Parcel 1. The Campagnas argue that the parties recognized and acquiesced in the established crop line as a boundary for more than 10 years. The record contains a survey dated January 28, 2003, which shows that the surveyors located a crop line on the Higdays' property, just south of the actual dividing line between the properties as surveyed. Dick testified that from 1992 to 2002, he farmed for the Campagnas the entire area north of the crop line. Dick also testified that the proceeds from the crops north of the crop line went to the Campagnas while the proceeds from the crops south of the crop line went to Ann.

Steve testified that he farmed the Higdays' land from 1992 through 2002, and he also stated that he followed the crop line, farming the area south of the crop line but not the area north of the crop line. Steve testified that the crop line was apparent, given that he and Dick would normally plant different types of crops.

The Campagnas argue that the trial court did not find mutual recognition and acquiescence as to the crop line because of the court's opinion that a crop line can never be a boundary. In *Nebraska State Bank v. Gaddis*, 208 Neb. 136, 138, 302 N.W.2d 686, 688 (1981), the Nebraska Supreme Court upheld a finding of adverse possession, stating: "There was no fence, but the crop line of the farmland formed a boundary line between the two properties. The land was cultivated each year and the crop line did not vary over the years." The court further noted, "None of the disputed strip was cultivated by the [party opposing adverse possession]." *Id.* Given the court's holding in *Nebraska State Bank v. Gaddis* and the uncontradicted evidence at trial regarding the parties' use of the crop line, we conclude that the trial court erred in failing to find that the Campagnas proved mutual recognition and acquiescence in the crop line of Parcel 1. Therefore, we modify the trial court's legal description of Parcel 1 to state the following:

> 2. A parcel of land being part of tax lot 3B3, located in the Northwest One-quarter of Section 3, Township 13 North, Range 13 East of the 6th P.M., Sarpy County,

Nebraska, being more particularly described as follows: beginning at the northwest corner of said tax lot 3B3; thence S89°17'25" E (assumed bearing) 776.99 feet along the north line of said tax lot 3B3; thence S01°08'55" W 35.00 feet; thence N85°04'52" W 150.00 feet; thence N88°09'11" W 627.35 feet to the west line of said tax lot 3B3 and to the west line of said Northwest One-quarter of Section 3; thence N01°11'34" E 11.54 feet along said west line to the point of beginning. Described parcel contains 15,558.53 square feet or 0.36 acres, more or less including 986.69 square feet of road right-of-way.

*Appeal—Alleged Failure to Describe Property.*

Ann contends that the trial court erred, given that its descriptions of the boundaries between the properties differed in the court's original order and its order as amended. After the court issued its order setting forth a general description of the boundaries using landmarks, the Campagnas filed a motion to alter or amend the judgment. The Campagnas did so for the purpose of incorporating the survey requested by the court or, in the alternative, asking the court to reference in its order the legal descriptions as set forth in the exhibits offered at trial. The Campagnas based their motion on *Inserra v. Violi*, 267 Neb. 991, 679 N.W.2d 230 (2004), which requires a court to include a precise legal description of property rather than general descriptions based on landmarks. The trial court then granted the Campagnas' motion and filed an amendment to the decree setting forth the legal boundaries "[i]n accord with the recommendations of counsel for both parties." Therefore, on this record, we cannot find that the trial court erred in amending its judgment to include precise descriptions of the boundaries at issue.

*Cross-Appeal—Failure to Receive Certain Photographs.*

In the Campagnas' cross-appeal, they contend that the court erred in failing to receive into evidence certain photographs of the properties. The Campagnas argue that the photographs were relevant and valuable to the record.

We note, though, that where evidence is cumulative to other evidence received by the court, its exclusion will not be considered prejudicial error. See *Chadron Energy Corp. v. First*

*Nat. Bank*, 236 Neb. 173, 459 N.W.2d 718 (1990). Because the photographs were merely cumulative to other testimony in this record, we cannot conclude that the trial court abused its discretion in excluding the photographs.

*Cross-Appeal—Adverse Possession of Parcels 1 and 2.*

The Campagnas also argue that the trial court erred in finding that they are not entitled to Parcels 1 and 2 by way of adverse possession. Given our finding that the Campagnas are entitled to Parcels 1 and 2 under the theory of mutual recognition and acquiescence, we conclude that we need not consider whether the Campagnas are also entitled to Parcels 1 and 2 by adverse possession. See *Kelly v. Kelly*, 246 Neb. 55, 516 N.W.2d 612 (1994) (appellate court is not obligated to engage in analysis which is not needed to adjudicate case and controversy before it).

## CONCLUSION

After reviewing the record, we conclude that the trial court did not err in concluding that the Higdays and the Campagnas mutually recognized and acquiesced in the side yard of Parcel 1 and in the fence line on Parcel 2 as boundaries between the properties. Similarly, the trial court did not to fail to exactly describe the boundaries between the two properties in its amended order. In regard to the Campagnas' cross-appeal, the trial court did not err in failing to receive certain photographs into evidence or in failing to find that the Campagnas are not entitled to Parcels 1 and 2 by way of adverse possession. The trial court did err in failing to quiet title in the Campagnas as to the area north of the crop line of Parcel 1, because the parties recognized and acquiesced in the established crop line as a boundary for more than 10 years. For this reason, we modify the trial court's order so as to quiet title in the Campagnas to the entirety of Parcel 1 as set forth in this opinion. The rest of the trial court's order is affirmed in its entirety.

AFFIRMED AS MODIFIED.