IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

HUDKINS V. HEMPEL

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

LARRY D. HUDKINS AND CAROL L. HUDKINS, HUSBAND AND WIFE, APPELLANTS,

V.

JON B. HEMPEL AND DEANNE PRINTZ, HUSBAND AND WIFE, APPELLEES.

Filed January 31, 2023.    No. A-21-1011.

Appeal from the District Court for Seward County: JAMES C. STECKER, Judge. Affirmed in part, and in part reversed and remanded with directions.

Stephen D. Mossman and Jacob C. Garbison, of Mattson Ricketts Law Firm, for appellants.

William G. Blake, of William Blake Law, for appellees.

PIRTLE, Chief Judge, and ARTERBURN and WELCH, Judges.

WELCH, Judge.

INTRODUCTION

Larry and Carol Hudkins (referred to collectively as "the Appellants") appeal from the Seward County District Court's order denying their request to quiet title to a strip of land between their property and an adjoining property owned by Jon Hempel and DeAnne Printz (referred to collectively as "the Appellees"), denying their claim for damages, and denying their motion for discovery sanctions against Appellees. For the reasons stated herein, we affirm in part, and in part reverse and remand with directions.

STATEMENT OF FACTS

In 1990, the Appellants purchased a tract of land legally described as the Southeast Quarter of Section 26, Township 12 North, Range 4 East in Seward County, Nebraska (the "Appellants' Property"). In 2017, the Appellees purchased the land immediately west of the Appellants'

- 1 -

Property legally described as the Southwest Quarter of Section 26, Township 12 North, Range 4 East in Seward County, Nebraska (the "Appellees' Property"). This dispute involves a strip of land that runs along the entire west boundary of the Appellants' Property and the east boundary of the Appellees' Property. The district court received into evidence as exhibit 34, a boundary survey prepared by Billy Joe Kerr, which legally described the strip of land at issue in these proceedings as follows:

> THE AREA WEST OF THE WEST LINE OF THE SOUTHEAST QUARTER OF SECTION 26, TOWNSHIP 12, RANGE 4 EAST, SEWARD COUNTY, NEBRASKA, BEING DESCRIBED AS FOLLOWS:
>
> COMMENCING AT THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF SAID SECTION 26; THENCE NORTHERLY ON THE WEST LINE OF SAID SOUTHEAST QUARTER ON AN ASSIGNED BEARING OF N 0°06'51"W A DISTANCE OF 33.00', TO THE POINT OF BEGINNING; THENCE CONTINUING NORTHERLY ON SAID WEST LINE, N 0°06'51"W 2595.00', TO A POINT OF INTERSECTION WITH AN EXISTING FENCE LINE; THENCE WESTERLY ON SAID FENCE LINE, N 89°04'09"W 13.90', TO A CORNER FENCE POST; THENCE SOUTHERLY ALONG AN EXISTING FENCE LINE FOR THE NEXT SIX (6) COURSES, S 2°12'15"W 39.14'; THENCE S 0°44'01"W 111.91'; THENCE S 0°07'14"W 80.84'; THENCE S 0°05'17"E 44.33'; S 0°16'13"W 162.42'; THENCE S 1°02'30"E 102.14', TO AN EXISTING CORNER POST; THENCE SOUTHERLY, S 0°16'55"E 2054.49'; THENCE EASTERLY, S 89°48'07"E 10.90', TO THE POINT OF BEGINNING, SAID TRACT CONTAINING AN AREA OF 37,893.6 SQUARE FEET OR 0.87 ACRES, MORE OR LESS.

We will hereinafter refer to this strip of land as the "Disputed Area."

Hudkins testified that he first set foot on the Appellants' Property in 1967, long before he purchased it. He testified that he formerly cut silage for a former owner of the Appellants' Property up to a barbed-wire fence that he believed physically served as the western boundary of the Appellants' Property and the eastern boundary of the Appellees' Property. Hudkins testified that the old fence aligned with a fence running north from the Appellants'/Appellees' Properties, which divided the properties to the northwest and northeast of the Appellants'/Appellees' Properties; and a fence running south from the Appellants' and Appellees' Properties, beginning south of Branched Oak Road, which divided the properties to the southwest and southeast of the Appellants'/Appellees' Properties.

Hudkins testified that after purchasing the Appellants' Property in 1990, although much of the old barbed-wire fence along the east/west boundary was gone, approximately 540 feet of fence beginning at the northwest corner of the Disputed Area and running directly south remained. Hudkins testified that the existing fence then turned eastward onto his land and that he used the northwest corner of his land, including land within the Disputed Area bordered by this fence, to graze his cattle. The parties refer to this existing fence as the "pasture fence." As to the remaining approximately 2,055 feet of property running south of the pasture fence along the west boundary of the Disputed Area, Hudkins testified there were remnants of the old barbed-wire fence in 1990,

while Hempel testified that the old barbed-wire fence was nonexistent by 2013. The district court physically walked this border area during the course of the trial and found there were no remnants of the old barbed-wire fence south of the pasture fence as of the time of the trial.

Hudkins testified that he took part in farming operations for former owners of the Appellants' Property up to the barbed-wire fence line when it existed and continuously farmed or otherwise possessed the land up to the point where he believed the old fence ran after acquiring the land in 1990. Hudkins testified that after the Appellees acquired the Appellees' Property in 2017 and had it surveyed, the Appellees placed stakes on the Appellants' Property in 2018, or sometime thereafter, east of the line where Appellants had been farming. Hudkins testified that this was his first notice that a dispute existed over their boundary line. Among other photographs, the record consists of photos contained within exhibit 29 which show the boundary stakes inserted by Appellees on or after 2018. In relation to those photos, Hudkins testified that he has been farming approximately 14 feet west of the stake line since 1990. More specifically, Hudkins testified that he grazed cattle west of that stake line within the pasture fence, used the land within the Disputed Area south of the pasture fence for farming or otherwise entering portions thereof in a federal CRP program, and continuously did so until Hempel made his claim for ownership of the land.

Hudkins testified that he discussed replacing the old barbed-wire fence with the Appellees' predecessors in title but that the project never moved forward due to financial and health constraints with those former owners. Hudkins testified that neither predecessor ever objected to the boundary line being the old fence line or to his farming of the land up to that line.

Once the Appellants and the Appellees recognized that there was a dispute over the Disputed Area, both made attempts to construct a fence along what each perceived to be the proper boundary line. When Hempel sent a fence contractor to commence building, Hudkins ordered them off the land. After Hudkins began constructing a fence, Hempel tore it down.

Kerr provided a legal description of the Disputed Area at the Appellants' request. When questioned by Appellees' counsel about the location of the west boundary of the Disputed Area, as depicted in exhibit 34, the following colloquy ensued:

A. Okay. Well, there's obviously a fence to the north.

Q. Mm-hmm.

A. And there's a fence south of the road. But I would assume that you are referencing the line that is per the landowner.

Q. Yes.

A. I did not see — I did not see any fence along that line.

Q. Location of fence per landowner. Why did you say that on this drawing?

A. I was requested to put that on there by the landowner. He wanted to know what that was and have a representation of it.

Q. Okay. So you could see the — where the fence started on the north. That was — I assume that was fairly easy to say "There it is. I'll measure and draw it."

A. Mm-hmm.

Q. But then you get to the south end of that existing fence.

A. Mm-hmm.

Q. How did you — how did you decide to line it up all the way to the south and across the road to the south?

A. As noted, it was per the landowner.

Q. He asked you to do that?

A. He asked me to draw that line on this piece of paper correctly.

Q. To draw what?

A. He requested that I put that line on this piece of paper.

Q. And how did you select that south end?

A. There's an existing fence down there that he wanted me to locate that's on the south side of the road.

Q. Okay. Let me look at another exhibit — have you look at it. I believe it's 92. It's in a different book than what you have in front of you right there.

A. This one? This one goes to 62. Forty-four and 62.

Q. Forty?

A. Forty-Four in this book, 62 in the other.

Q. Well, let's go to 50 — let's go to 58, I think. Let me look before I waste your time.

A. Okay? A?

Q. Do you have a 58 — 58I, turning a few pages?

A. Okay.

Q. Is that the existing fence to the south side that you lined up with?

A. That is correct.

Q. And that was at Mr. Hudkins request?

A. Yes.

Q. Did — and whereabouts did you line it up?

A. With that corner fence post that's up to the right side of the gate.

Q. The right fence post. Did you look to see if there's a fence attached to that?

A. Going south?

Q. Yes.

A. Well, I did a survey on the property that this is in reference to, and there is a fence that goes —

Q. Is —

A. — south.

The Appellants ultimately filed suit seeking to quiet title to the Disputed Area in their name under the doctrines of adverse possession and mutual recognition and acquiescence, seeking damages from the fence that the Appellees removed, and seeking an injunction restraining the Appellees from entering on the Appellants' land. During the trial, the Appellants also sought discovery sanctions for the Appellees failing to produce a survey involving the Disputed Area which the Appellants claimed was responsive to discovery requests, but which the Appellees failed to reveal until the time of trial.

A bench trial was held over 3 days in April and July 2021. In a detailed order dated November 23, 2021, the district court denied all forms of recovery sought by the Appellants which order will be discussed more thoroughly in the analysis section of this opinion. The Appellants now appeal from that final order disposing of their complaint.

## ASSIGNMENTS OF ERROR

The Appellants' assignments of error, restated, are that the district court erred (1) in refusing to quiet title in favor of the Appellants to the Disputed Area under the doctrines of adverse possession or mutual recognition and acquiescence, (2) in denying the Appellants' claim for damages arising from Appellees' destruction of a rebuilt fence erected along the border of the Disputed Area, and (3) in denying the Appellants' motion for sanctions in connection with Appellees' failure to turn over a survey relating to the Disputed Area.

## STANDARD OF REVIEW

An action to ascertain and permanently establish corners and boundaries of land under Neb. Rev. Stat. § 34-301 (Reissue 2016) is an equity action. *Bush Island v. Kortum*, 30 Neb. App. 79, 965 N.W.2d 809 (2021).

In an appeal from an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided that where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Campagna v. Higday*, 14 Neb. App. 749, 714 N.W.2d 770 (2006).

With respect to damages, an appellate court reviews the trial court's factual findings under a clearly erroneous standard of review. *Bedore v. Ranch Oil Co.*, 282 Neb. 553, 805 N.W.2d 68 (2011).

The determination of an appropriate discovery sanction rests within the discretion of the trial court, and an appellate court will not disturb it absent an abuse of discretion. *Hill v. Tevogt*, 293 Neb. 429, 879 N.W.2d 369 (2016). A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## ANALYSIS

The Appellants assign that the district court erred in failing to quiet title to the Disputed Area in their favor under the doctrines of adverse possession or mutual recognition and acquiescence. We first address the Appellants' claim regarding adverse possession.

### ADVERSE POSSESSION

A party claiming title through adverse possession must prove by a preponderance of the evidence that the adverse possessor has been in (1) actual, (2) continuous, (3) exclusive, (4) notorious, and (5) adverse possession under a claim of ownership for a statutory period of ten (10) consecutive years. *Siedlik v. Nissen*, 303 Neb. 784, 931 N.W.2d 439 (2019). The Appellants argue

that the entirety of the Disputed Area meets all of the elements of adverse possession and he was entitled to an order quieting title to the Disputed Area in his favor.

In examining this assignment of error, we first provide clarity regarding the Disputed Area because the district court appeared to treat portions of the Disputed Area differently. The district court referred to the entirety of the strip of land in dispute as the "approximately 20 feet of land along the half section line between" the Appellants' Property and the Appellees' Property. More specifically, according to Kerr's boundary description contained within exhibit 34, the Disputed Area consists of a strip of land extending for approximately 2,595 feet in length from north to south along the east/west border of the Appellees'/Appellants' Properties; extending approximately 13.9 feet in width from west to east on the north end of the Appellants'/Appellees' Properties; and extending 10.9 feet in width from west to east on the south end of the Appellants'/Appellees' Properties.

Importantly, the parties do not dispute the land contained a standing fence commencing on the northwest corner of the Disputed Area which extended approximately 540 feet from north to south along the east/west border of the properties which fence Hudkins testified he used since 1990 to enclose his cattle. That fence on the north end extended 13.9 feet onto land that Hempel claims he owns. At the south end of the 540 feet stretch, the fence then turns eastward onto the Appellants' Property so there is no continuing existing fence running the remaining approximate 2,055 feet of the proposed west border. This existing fence, which the parties refer to as the pasture fence, is significant because it appears to be treated differently by the district court. As to that fenced-in portion of the Disputed Area comprising approximately 540 feet on the proposed west border running from north to south and extending approximate 13.9 feet onto the Appellees' Property, the court appeared to deny the Appellants' request to quiet title only because the Appellants failed to provide an adequate legal description for that portion, and not because the Appellants otherwise failed to satisfy their burden of proof as to adverse possession for that portion. Instead, in examining the Appellants' claim for adverse possession, the court appears to focus its analysis on the remaining approximate 2,055 feet south of the pasture fence comprising the remainder of the west border where the Appellants argued an old barbed-wire fence formerly existed and had since been removed.

We thus first focus our analysis on the approximate 2,055 feet of the Disputed Area that runs south of the pasture fence on the proposed west border of the Appellants' and Appellees' Properties which according to Kerr's legal description extends approximately 10.9 feet onto the Appellees' Property at the south end. As to that portion of the Disputed Area, the Appellants claim that the Appellants' and the Appellees' Properties were originally bordered by an old barbed-wire fence, remnants of which were visible in 1990 when the Appellants first purchased the Appellants' Property, and that Hudkins has continuously farmed up to the border of what he believed to be that fence line until the Appellees began to object to his use of that land sometime during or after 2018. As to the entirety of the 2,055 feet of land south of the pasture fence within the Disputed Area, Hudkins testified that he used that land to raise crops and eventually enlisted a portion in the Federal Conservation Reserve Program (CRP). Hudkins also provided testimony from his former tenant and a tenant of the Appellees' predecessors in title who attested to the Appellants continuously farming the land up to what the individuals perceived to be the old barbed-wire fence

line. Although the fence was no longer there, Hudkins testified that it formerly aligned with the pasture fence to the north which further aligned with a fence running north of the Appellants' and Appellees' Properties and a fence running south from the Appellants' and Appellees' Properties on the south side of Branched Oak Road. Kerr testified that he drew the west boundary to align the south end of the pasture fence with the corner fence post south of Branched Oak Road which Hudkins described as "the fence" which formerly aligned with the now missing fence.

Notwithstanding that testimony, the district court affirmatively denied the Appellants' claim of adverse possession to the land within the Disputed Area south of the pasture fence. The district court's rationale is quoted at length below:

The [Appellants] allege that they are entitled to quiet title under the doctrine of adverse possession. In order to prove title to land under the doctrine of adverse possession, the party claiming ownership must prove that they have had (1) actual; (2) continuous; (3) exclusive; (4) notorious; and (5) adverse possession for a period of 10 or more years. *Royal v. McKee*, 298 Neb. 560, 566 N.W.2d [51] (2017) . . .

[The Appellants have] met the first requirement of actual possession of the Disputed Area. [Hudkins] testified that he and his tenant mowed the disputed area for the requisite 10 years.

The second requirement is that the possession be continuous. [The Appellants have met] this requirement. The testimony is that [the Appellants] mowed the Disputed Area for the requisite 10 years.

The third requirement is that [the Appellants exercised] exclusive and adverse control of the Disputed Area. The evidence is in conflict on this requirement. [Hempel] testified that he and his tenant mowed the disputed area over the same time frame that [the Appellants claim] exclusive possession. The Court cannot find that [the Appellants] met the exclusive requirement of adverse possession.

The fourth requirement is that the possession be notorious. The testimony is that as of 1990 only remnants of a fence existed. After 1990 to 2019, no fence existed. After the [Appellants] purchased the quarter, they made no effort to make their "possession" notorious. The Court finds that the [Appellants] failed to meet this requirement. [The Appellants rely] on the existence of a fence in 1967 that was in place for over 10 years. In 1990, only remnants of the fence remained. After [the Appellants] purchased the property, [the Appellants] did not attempt to exercise exclusive control over the Disputed Area. [The Appellants] did not rebuild the fence to put [the Appellees] or their predecessors on notice of a claim of ownership. The Court cannot determine the intent of the owners from 1967 to 1990 of the adjoining quarters. The Court viewed the property and could not determine the location of any such fence that existed in 1967. The evidence was in conflict as to the location of the fence that existed in 1967. The Court cannot find by a preponderance of the evidence that [the Appellants'] predecessor in title acquired title by adverse possession as a result of the existence of a fence that was present in 1967. No evidence was adduced as to the purpose of the fence other than [Hempel's] statement as to his understanding of the fence. The evidence does not establish that the fence that existed in 1967 was intended to be a boundary fence. The Court cannot find that the fence existed on the line [that Hudkins]

contends. [Hudkins] alleges that [he] entered a portion of the disputed land in the [CRP]. The FSA maps in evidence show only that the Southeast Quarter was enrolled by [the Appellants]. [Appellants'] case regarding the exclusive use of the property by his predecessor in title before 1990 relies on unconfirmed conversations with dead people in which only [Hudkins] participated and which cannot be confirmed and are not corroborated by any other evidence.

As to the approximately 2,055 feet of land within the Disputed Area south of the pasture fence, the district court found that the Appellants satisfied the elements of actual and continuous possession of that land for the requisite 10-year period, and we agree. Upon our de novo review of the record, the Appellants provided unrefuted testimony that from at least 1990 through 2018, the Appellants actually and continuously farmed this area, primarily used as hay fields, and entered the remainder into CRP at different times between 1990 and 2018.

Notwithstanding its findings that the Appellants actually and continuously possessed the Disputed Area, the district court concluded that because the Appellants never replaced the old barbed-wire fence running south of the pasture fence after 1990, the Appellants failed to make a provable claim of notorious use of all the land within the Disputed Area he claims was acquired through adverse possession. Without an existing fence, the district court stated, "the court cannot find that the fence existed along the line that [the Appellants contend]." Following our de novo review of the record, we disagree.

Ownership is considered "notorious" when a party claiming title takes actions that would put an ordinarily prudent person on notice of the fact that the lands are in the adverse possession of another. *Siedlik v. Nissen*, 303 Neb. 784, 931 N.W.2d 439 (2019). As we read the district court's order, the district court found that the Appellants failed to prove notorious possession of the 2,055 foot strip of land south of the pasture fence because the court could not find sufficient evidence of the location of the old fence, the Appellants failed to rebuild one, and the evidence did not preponderate in favor of finding that the Appellants notoriously used the land up to the line drawn on Kerr's survey given that the actual location of the old boundary fence was unknown. But as the Nebraska Supreme Court noted in *Wanha v. Long*, 255 Neb. 849, 857, 587 N.W.2d 531, 539 (1998), "It is not necessary that a party prove a complete enclosure or that he remain continuously on the land for the statutory period, but only that the land be used continuously for the purposes to which it was by its nature adapted." In *Wanha*, the court found that the plaintiff's construction of a sidewalk on and seeding the disputed property, which they exclusively maintained conspicuously, was sufficient to constitute actual and continuous possession of the land for the statutory period. And when examining whether the plaintiff's actions were sufficiently notorious, the Nebraska Supreme Court held:

> The acts of dominion over land allegedly adversely possessed must, to be effective against the true owner, be so open, notorious, and hostile as to put an ordinarily prudent person on notice of the fact that the lands are in the adverse possession of another. *Gustin v. Scheele*, 250 Neb. 269, 549 N.W.2d 135 (1996); *Kraft v. Mettenbrink*, 5 Neb. App. 344, 559 N.W.2d 503 (1997). If an occupier's physical actions on the land constitute visible and conspicuous evidence of possession and use of the land, that will generally be sufficient to

establish that possession was notorious. *Dugan v. Jensen, supra*. Although the enclosure of land renders the possession of land open and notorious, and tends to show that it is exclusive, it is not the only way by which possession may be rendered open and notorious, see *Purdum v. Sherman*, 163 Neb. 889, 81 N.W.2d 331 (1957); nonenclosing improvements to land, such as erecting buildings or planting groves or trees, which show an intention to appropriate the land to some useful purpose, are sufficient, see *Brownfield v. Bleekman*, 4 Neb. (Unoff.) 443, 94 N.W. 714 (1903). See, also, *Woodcock v. Unknown Heirs of Crosby*, 92 Neb. 723, 139 N.W. 646 (1913).

*Wanha v. Long*, 255 Neb. at 858, 587 N.W.2d at 539-40.

Here, Hudkins provided uncontroverted testimony that he possessed, farmed, and otherwise maintained the land south of the pasture fence up to what he believed to be the old barbed-wire fence, which he thought was the legal boundary line. To that end, he unequivocally testified he actively, continuously, and openly possessed, farmed, and otherwise maintained the land up to the point where he believed the fence existed from 1990 through 2018. And although we understand the difficulty in describing the western boundary of that line without the existence of a fence south of the pasture fence, we do not find the lack of a fence dispositive of the issue.

The issue is not whether Kerr's western boundary describes exactly where the old fence was located (as does Kern's description of the pasture fence north of it). The issue is whether the Appellants proved that they actually, continuously, exclusively, notoriously, and adversely possessed the land under a claim of ownership up to the western boundary drawn by Kerr. We find that they did. The evidence demonstrated that following the Appellees' acquisition of the Appellees' Property in 2017, Hempel commissioned a survey and placed stakes along his east property line sometime during or after 2018 consistent with that survey. This staking of the property line placed the Appellants on notice that the Appellees were claiming ownership of land east of what the Appellants believed to be the property line. In connection therewith, the Appellants offered a number of photos, admitted as exhibit 29, which clearly depict the stakes placed by the Appellees and clearly demonstrate the contours of the Appellants' farming operations west of that line. When asked to explain the distance between the stakes and the visible contours on the land which depict the Appellants' farming operations, Hudkins described the distance as approximately 14 feet.

Second, when the photographs contained in exhibit 29 are viewed together with other exhibits, including but not limited to exhibit 62, one can see visible evidence of the contours of the Appellants' farming operation extending south from the pasture fence in a manner consistent with Hudkins' description of where the old fence used to be and which he physically described as approximately 14 feet. That testimony was not controverted.

Third, when asked to draw the western boundary of the Disputed Area, Kerr testified that he drew the boundary line starting from a fence post immediately south of the Disputed Area south of Branched Oak Road (the south pole) and aligned it with the south end of the existing pasture fence. As to that south pole, Hudkins previously testified that a fence extending south from that south pole formerly aligned with the old barbed-wire fence, the pasture fence, and a fence extending to the north of the Appellants' and the Appellees' Properties. And although the parties

disputed whether there was a current fence running south from that south pole, there was no evidence to dispute the Appellants' claim that the old barbed-wire fence aligned formerly with the south pole and a fence running south of it.

After reviewing Kerr's legal description of the Disputed Area, it is clear that the area is drawn with a width of 10.9 feet on the south end and 13.9 feet on the north end. In relation to this area, the record provides unrefuted testimony of the following: (1) The western boundary, as drawn by Kerr, aligns with the pasture fence and fence extending north of the pasture fence, and the south pole, and a fence which, at least at one time, extended to the south of the Appellants' and Appellees' Properties; (2) The western boundary drawn by Kerr is where Hudkins testified the former barbed wire fence was situated, regardless of whether it existed at the time of trial; (3) The western boundary drawn by Kerr is where Hudkins testified he actually, continuously, exclusively, notoriously, and adversely farmed or placed the land in CRP since 1990 because that is what he believed to be the property line; (4) That photos depicted in Exhibit 29 depict the legal boundary line approximately 14 feet east of the contoured land that the Appellants were farming consistent with Hudkins' uncontroverted testimony that he was farming west of that line; and (5) That the aerial video depicted in exhibit 62 further demonstrates that the Appellants were farming along a line extending south of the pasture fence and property line to the north and south which aligned with the pasture fence and which was consistent with Hudkins' unrefuted testimony that he actually, continuously, exclusively, notoriously, and adversely farmed along that line since 1990.

Based upon this evidence, notwithstanding the fact that a fence no longer existed south of the pasture fence by the time of trial, we find that the Appellants proved by a preponderance of the evidence that their actual and continuous use of the land extended to the west boundary line of the Disputed Area as described by Kerr in his survey, that their farming operations were visible and conspicuous to that boundary line since at least 1990 through 2018, and that the Appellants' possession of the strip of land was sufficiently notorious for a period of at least 10 years.

The district court separately found that the Disputed Area south of the pasture fence was not exclusively used by the Appellants due to the Appellees' tenant mowing the property "over the same time frame."

As the Nebraska Supreme Court held in *Dugan v. Jensen*, 244 Neb. 937, 942, 510 N.W.2d 313, 317 (1994), "possession must be exclusive, and if the occupier shared the possession with the title owner, the occupier may not obtain title by adverse possession." Although there was testimony that after the Appellees discovered the property line dispute in approximately 2018, Hempel ordered his tenant to begin mowing within the Disputed Area south of the pasture fence, there was no testimony offered by Hempel or otherwise which contradicted Hudkins' testimony that the Appellants exclusively possessed the land within the Disputed Area from at least 1990 to 2018. Based upon our de novo review, we find that the Appellants' actual, continuous, and notorious use of the Disputed Area south of the pasture fence occurred exclusively during the entirety of the requisite 10-year period.

Finally, although the district court did not specifically address the Appellants' claim to the final element of adverse ownership, we will do so now. In describing this element of adverse

possession, the Nebraska Supreme Court held in *Wanha v. Long*, 255 Neb. 849, 859-60, 587 N.W.2d 531, 540 (1998):

> Title may be acquired by adverse possession though the claim of ownership was invalid and the occupant believed he was asserting legal rights only. *Erickson v. Crosby*, 100 Neb. 372, 160 N.W. 94 (1916). The claim of adverse possession is founded upon the intent of the occupant, *such intent being determined by his acts. Nennemann v. Rebuck*, 242 Neb. 604, 496 N.W.2d 467 (1993). Intent, even though mistaken, is sufficient where the claimant occupies to the wrong line believing it to be true and even though he does not intend to claim more than that described in the deed. *Weiss v. Meyer*, [208 Neb. 429, 303 N.W.2d 765 (1981)]. The possession of the occupant is not less adverse because he took and had possession innocently and through mistake; it is the visible and exclusive possession with intention to possess the land occupied under the belief that it belongs to him that constitutes its adverse character. *Vrana v. Stuart*, 169 Neb. 430, 99 N.W.2d 770 (1959).

We find that the unrefuted testimony establishes that since at least 1990 through 2018, the Appellants had been farming over the west line of his actual boundary up to the western line drawn by Kerr which the Appellants believed to be where an old perimeter fence was located under the mistaken belief that it was his property. Because the record indicates that the Appellants' possession of the land within the Disputed Area south of the pasture fence was actual, continuous, exclusive, notorious, and adverse to Appellees and his predecessors over a period, in this case, exceeding 10 years, we find that the Appellants met their burden of proof that they acquired the Disputed Area through the doctrine of adverse possession.

As to the land extending approximately 13.9 feet east to west and 540 feet north to south enclosed by the pasture fence, we likewise find the testimony established that the Appellants adversely possessed this property and were entitled to their request to quiet title in their name. As we indicated before, the district court appeared to draw the same conclusion but denied the Appellants' claim to this enclosed area because the Appellants' legal description extended the entire duration of the proposed west boundary and was not contained solely to the area of the pasture fence. Because we find that the Appellants met their burden of proof on their claim of adverse possession governing the entirety of the Disputed Area, we reverse the district court's order and remand with directions to quiet title to the Disputed Area in the Appellants in accordance with the legal description set forth by Kerr in exhibit 34. Because of our findings, we need not address the Appellants' separate assignment that the court erred in failing to find that he acquired the Disputed Area through mutual recognition and acquiescence.

DAMAGES FOR TRESPASS AND DISCOVERY SANCTIONS

Having determined that the Appellants are entitled to an award quieting title in the Disputed Area in his name, we now turn to the Appellants' claims that the district court erred in failing to award damages for the fence the Appellants began to construct in 2019, that was torn down by the Appellees, and his claim for damages for not being able to graze cattle on the CRP land without that fence.

Among other findings, the district court concluded that the Appellants failed to adduce sufficient evidence from which the court could determine an amount to replace the fence removed by the Appellees. We agree. Although the Appellants began to construct a fence on portions of the Disputed Area extending from the pasture fence, after hearing the evidence, the district court concluded that the fence the Appellants constructed was not a legal fence as defined by Neb. Rev. Stat. § 34-115 (Reissue 2016).

Section 34-115 defines lawful fences of different types used to enclose lands. After viewing the evidence, the district court determined that the fence that the Appellants attempted to construct did not conform to the requirements set forth in § 34-115. Whether the fence the Appellants constructed was a lawful fence presents a question of fact for the trial court judge. Where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Campagna v. Higday*, 14 Neb. App. 749, 714 N.W.2d 770 (2006). Applying that weight here, we find that the court did not clearly err in finding that the fence that the Appellants partially constructed was not a legal fence as defined by § 34-115.

Having found that the Appellants' partially constructed fence was not a legal fence, we agree with the trial court that the Appellants' offer of proof for damages associated with replacing the fence was not for the costs associated with what he installed, but an estimate for the cost to replace a fence which we understand to mean a conforming one. Because the Appellants' evidence of damages does not conform with what they allegedly lost, we agree with the district court that the Appellants failed to prove actual damages. See *Miller v. Stan Ortmeier Constr. Co.*, 229 Neb. 259, 426 N.W.2d 272 (1988) (holding evidence must be sufficient to enable trier of fact to estimate with reasonable degree of certainty and exactness actual damages suffered).

As to the Appellants' claim that they lost out on the ability to graze cattle on the CRP lands bounded by their replacement fence after the Appellees removed it, the district court found that the Appellants failed to mitigate the loss by placing a temporary electric fence along the property which would have accommodated their proposed use and otherwise found that the Appellants' claim for damages was not credible. The Appellants' theory of recovery here was based upon Hudkins testimony that a new federal program would have permitted him to graze his cattle for 30 days on land that was formerly subject to a CRP contract. The Appellants claim that because Appellees removed the Appellants' fence impacting the applicable CRP ground, they were unable to take advantage of this business opportunity and were forced to purchase feed for the cattle they could have otherwise grazed on that land. When asked whether the Appellants could have installed a temporary electric fence to support their proposed use of the CRP land, the Appellants acknowledged they could have, but argued that prior attempts to install an electric fence resulted in damage from deer so they opted not to pursue it. The district court found the Appellants' claim for damages to be not credible.

The Appellants' claim for damages relates to a proposed lost business opportunity that they have not pursued before. As the Nebraska Supreme Court explained in *Shipler v. General Motors Corp.*, 271 Neb. 194, 231, 710 N.W.2d 807, 839 (2006):

A plaintiff's evidence of damages may not be speculative or conjectural and must provide a reasonably certain basis for calculating damages. *Pribil v. Koinzan*, 266 Neb.

222, 665 N.W.2d 567 (2003). "The general rule is that uncertainty as to the fact of whether damages were sustained at all is fatal to recovery, but uncertainty as to the amount is not if the evidence furnishes a reasonably certain factual basis for computation of the probable loss." *Id.* at 226-27, 665 N.W.2d at 572. Proof of damages to a mathematical certainty is not required, but a plaintiff's burden of offering evidence sufficient to prove damages cannot be sustained by evidence which is speculative and conjectural. See *id.* The proof is sufficient if the evidence is such as to allow the trier of fact to estimate actual damages with a reasonable degree of certainty and exactness. See *id.*

The Appellants' claim of a lost business opportunity presented a question of fact as to whether the Appellants actually sustained this loss from the Appellees' removal of the fence. As to that factual inquiry, the district court found that the Appellants' claim was not credible. As to questions of fact, we may provide weight to the district court who heard and observed the witnesses. *Adair Holdings v. Johnson*, 304 Neb. 720, 936 N.W.2d 517 (2020). When providing that weight here, we find the district court did not clearly err in concluding the Appellants' claim did not preponderate in favor of recovery as to the fact that they sustained that loss.

The Appellants finally argue that the district court abused its discretion in failing to grant their motion for discovery sanctions for the Appellees' failure to turn over a survey authored by Kerry Simonds. The document, admitted as exhibit 71, appears to be a drawing made by a surveyor, Simonds, identifying the location of the fence built by the Appellants which was later torn down by the Appellees. After reviewing the evidence propounded by the parties, the district court overruled the motion finding that the document admitted as exhibit 71 was not a survey, appeared to be an aid to the court, and was not dispositive of anything in the trial. The Appellants argue that the document was responsive to their Request for Production number 2 which requested "All photographs, diagrams, or other representations in Hempel and Printz's possession involving their property as legally described." The Appellants also argued it was responsive to a Request for Production number 11 governing surveys, to which Appellees replied, "The only surveys have been identified and provided under Request No. 2 above."

In determining whether discovery sanctions are appropriate, trial courts should consider the existence of unfair prejudice suffered by the party seeking sanctions, the importance of the evidence at the root of the misconduct, and whether the party to be sanctioned acted in bad faith. *Eletech, Inc. v. Conveyance Consulting Group*, 308 Neb. 733, 956 N.W.2d 692 (2021). An appellate court reviews a district court's order denying a motion for sanctions for an abuse of discretion. *Charles Sargent Irr. v. Pohlmeier*, 27 Neb. App. 229, 929 N.W.2d 527 (2019). After reviewing the affidavits submitted by the parties, including but not limited to the Appellees and the Appellees' counsel's contentions that they were not aware of the existence of the document prior to trial, we cannot say that the district court abused its discretion in denying discovery sanctions.

## CONCLUSION

For the reasons stated above, we affirm in part, reverse in part, and remand with directions to quiet title to the Disputed Area in favor of the Appellants.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.